**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Southern Division)**

| | |
|---|---|
| CLAUDIO DE SIMONE | * |
| Routte des Chenolettes 51 | |
| 1660 Chateau D'oex | * |
| Switzerland | |
| | * |
| Plaintiff, | |
| | * |
| v. | |
| | * |
| VSL PHARMACEUTICALS, INC. | |
| 800 South Frederick Avenue, Suite 300 | * |
| Gaithersburg, MD  20878-4153 | |
| [Montgomery County] | * |
| | |
| Serve on:  Corporation Trust, Incorporated | * |
| 351 West Camden Street | |
| Baltimore, MD  21201 | * |
| | |
| – and – | * |
| | |
| SIGMA-TAU | * |
| PHARMACEUTICALS, INC. | |
| 9841 Washingtonian Boulevard, Suite 500 | * |
| Gaithersburg, MD  20878-7352 | |
| [Montgomery County] | * |
| | |
| Serve on:  Corporation Trust, Incorporated | * |
| 351 West Camden Street | |
| Baltimore, MD  21201, | * |
| | |
| Defendants. | * |

Case No. 8:15-cv-01356

---

## COMPLAINT

Plaintiff, Professor Claudio De Simone ("Prof. De Simone"), by and through undersigned

counsel, as and for his Complaint against Defendants VSL Pharmaceuticals, Inc. ("VSL Inc.")

and Sigma-Tau Pharmaceuticals, Inc. ("STP Nevada"), avers as follows:

1

## NATURE OF THE ACTION

1.      Prof. De Simone brings this action to protect his exclusive legal rights over valuable intellectual property consisting of a unique probiotic medical food that he invented to manage rare and persistent gastrointestinal disorders.  Prof. De Simone seeks substantial compensatory and punitive damages, as well as comprehensive declaratory and injunctive relief, to remedy gross misconduct committed by his former business partners as they have misappropriated and profited illegally from his proprietary inventions.  Prof. De Simone also asks the Court to stop the former partners—a group of companies controlled by the wealthy and powerful Cavazza family in Italy—from selling a counterfeit version of Prof. De Simone's invention under the "VSL#3 brand," which poses a considerable danger to adult and pediatric consumers suffering from ulcerative colitis, pouchitis and irritable bowel syndrome in the United States.

2.      Prof. De Simone is a renowned scientist, inventor, physician, and leader in a new field of medical research focused on the health benefits of certain "friendly" bacteria that live on and within the human body.  He is a Professor of Gastroenterology and Immunology, a Fellow of the American Gastroenterology Association, and an inventor of bacterial compositions used in the fields of human and veterinary nutrition and hygiene.  Prof. De Simone has authored hundreds of clinical studies and scholarly papers in the field of probiotics, and he also has developed a series of new probiotic products that have helped thousands of people afflicted with gastrointestinal disorders.

3.      Some 15 years ago, Prof. De Simone entered into a joint venture with two brothers, Claudio and Paolo Cavazza, who controlled one of the largest pharmaceutical conglomerates in Italy—the Sigma-Tau Group.  The Sigma-Tau Group, a portion of which was

recently combined with the Italian pharmaceutical company Alfa Wasserman, is in the business of developing and selling research-based pharmaceuticals and currently employs over 2,500 people world-wide.

4.      At the outset of their business relationship, the three men struck a deal by which they combined their various talents, skills, and resources to develop and market some of Prof. De Simone's probiotic inventions to the consuming public.  One of the most important results of this partnership has been the commercial exploitation of a probiotic food product, consisting of live, freeze-dried, pure lactic acid bacteria, which has been marketed under the name "VSL#3."  The product is intended to provide dietary management for patients with serious gastrointestinal disorders.

5.      Prof. De Simone agreed to license portions of his intellectual property rights to the enterprise, while the Cavazza brothers agreed to contribute capital and business expertise to establish and fund its activities.  To implement their plan, Prof. De Simone and the Cavazza brothers formed a company in the United States, VSL Pharmaceuticals, Inc. ("VSL Inc."), which would later come to sell VSL#3 under license from Prof. De Simone.  This product was and continues to be manufactured based on highly secret, proprietary information that Prof. De Simone owns and which is a valuable trade secret.  It was also patented in the United States by Prof. De Simone under Patent No. 5,716,615.

6.      Over the ensuing years, VSL#3 became the "gold standard" in its therapeutic class.  This favorable recognition of VSL#3 by the medical and scientific community led to business success for the enterprise created by Prof. De Simone and the Cavazza brothers.  Aggregate global sales of VSL#3 are estimated to have grown to more than $60 million.

7.    Despite this financial success (or perhaps because of it), however, the friendship and business partnership between Prof. De Simone and the Cavazza brothers began to show signs of cracking.  Prof. De Simone had granted to VSL Inc. rights to use his proprietary information for VSL#3 to market and sell the probiotic food product in the United States for a limited period of time.  These rights were contained in two key agreements, a Patent License Agreement, formed in 2001, and a Know How License Agreement, formed in 2010.  VSL Inc., in turn, sub-licensed these rights to STP Nevada, the Cavazza-owned subsidiary of the Sigma-Tau Group that assumed responsibility for actually distributing and selling the product in this country.  At the time the dispute that is the subject of this case arose, VSL Inc.'s license from Prof. De Simone was set to expire on January 31, 2016, and STP Nevada's sub-licensed rights from VSL Inc. were set expire at the end of 2015.

8.    Claudio Cavazza died in 2011, and his children inherited his interests in the Sigma-Tau Group's pharmaceutical and nutraceutical empire.  After Claudio's death, his brother Paolo, Claudio's heirs, and their surrogates within the Sigma-Tau Group began pressuring Prof. De Simone to extend VSL Inc.'s and STP Nevada's licenses under new terms that would disproportionately benefit the Sigma-Tau Group at the expense of Prof. De Simone and VSL Inc., the business enterprise that he jointly owned with them.  A key part of the Cavazzas' plan was to convince, and if that did not work, then to coerce, Prof. De Simone to relinquish his tight control over the manufacturing process and allow the Sigma-Tau Group to produce a "fake" version of VSL#3 with cheaper ingredients, thereby increasing the Cavazzas' profit margins for STP Nevada.

9.    When Prof. De Simone resisted these pressures because of his concerns for consumer safety and the inherent deceptiveness of the Cavazzas' scheme, the Cavazzas initiated

a coordinated program to intimidate, threaten, and bully Prof. De Simone into complying with their demands.  The Cavazzas explicitly threatened to use their massive financial resources to sue him and to bankrupt him, his family, and VSL Inc. through the litigation process.  They planned to use their control over the VSL#3 trademark to market the new, adulterated product under the old name in order to deceive the consuming public into thinking that the bastardized version was the same as the original "gold standard."  Prof. De Simone became very concerned that if the Sigma-Tau Group succeeded in creating and marketing a fake VSL#3 product, it would put the patients who depend on this product at risk for serious infections.  Such a product would not have had its efficacy and safety proven in any randomized controlled study, as the genuine product has done repeatedly.

10.     Regrettably, the Cavazzas' intimidation scheme did not stop at mere threats.  In 2014, they sued VSL Inc. and Prof. De Simone in Delaware and the United Kingdom, respectively, and there contended for the very first time—falsely and in utter disregard for their repeated previous contractual acknowledgments—that Prof. De Simone's VSL#3-related patent rights and trade secrets actually belonged to them.  The Delaware litigation was principally filed to gain access to VSL Inc.'s books and records (and, in reality, Prof. De Simone's trade secrets), so the ownership of that intellectual property was not directly at issue.  In the UK litigation, by contrast, the question of ownership was at the heart of the Cavazzas' complaint, but the court there dismissed the action for lack of jurisdiction.  Regardless, it was now eminently clear that the Cavazzas had repudiated their contractual acknowledgments of Prof. De Simone's ownership of the VSL#3 trade secrets and would stop at nothing to steal what he would not relinquish through negotiation—unilateral control over the valuable VSL#3 probiotic formulation and all of the profits that his invention had yielded.

11.     In November 2014, once the aforementioned Delaware litigation had been settled, Prof. De Simone resigned his positions as a director and officer of VSL Inc. and terminated the Know How Agreement with that company.  By early February 2015, the Patent License Agreement between Prof. De Simone and VSL Inc. had expired by its own terms.  VSL Inc. also was in material breach of its obligations under this agreement as a result of its failure to make royalty payments due for 2014.  Although STP Nevada's sub-license with VSL Inc. formally has not been terminated, VSL Inc. no longer can legally honor that sub-license, and STP Nevada no longer can legally perform under the sub-license, because VSL Inc.'s own licensing rights from Prof. De Simone are no longer valid.

12.     Despite the termination and expiration of these rights, the Cavazzas have continued to use their voting and managerial control of both VSL Inc. and STP Nevada to continue marketing and selling VSL#3 in the United States without paying Prof. De Simone royalties (as they originally had contracted to do) and in reckless disregard of his intellectual property rights in VSL#3.  In addition, as long suspected by Prof. De Simone, the Cavazzas' efforts to commercialize a "fake" probiotic product under the well-known VSL#3 brand are at an advanced stage.

13.     By this Complaint, Prof. De Simone now seeks the intervention of this Court to help extricate himself from VSL Inc. and the Cavazza family, secure unpaid royalties, declare his legitimate ownership of the product know-how rights and ensure that patients in the U.S. are not put at risk with a counterfeit product.

14.     Based on the circumstances summarized above and the additional averments set forth below, this Court should declare that Prof. De Simone alone continues to own the trade secrets underlying the VSL#3 formulation, enjoin VSL Inc. and STP Nevada from infringing on

Prof. De Simone's exclusive intellectual property rights, and hold them liable in damages for breach of contract, misappropriation of trade secrets, and civil conspiracy.  The Court also should order both companies to disgorge to Prof. De Simone all profits that they have unjustly gained from their unlawful conduct.  Moreover, given the malicious course of intimidation pursued by the Defendants in this case, they should be held liable for punitive damages as well.

## PARTIES

15.     Prof. De Simone is a citizen of Italy who maintains his residence and domicile in Switzerland.  Prof. De Simone therefore is a citizen of a foreign state.

16.     VSL Inc. is a corporation organized and incorporated under the laws of Delaware, and, according to the Maryland State Department of Assessments and Taxation, its principal place of business is located at 800 South Frederick Avenue, Suite 300, Gaithersburg, MD 20878-4153.  VSL Inc. therefore is a citizen of Delaware and Maryland.

17.     VSL Inc., through its corporate hierarchy, is majority-owned and controlled by the Cavazza family and their surrogates.

18.     STP Nevada is a corporation organized and incorporated under the laws of Nevada, and its principal place of business is located at 9841 Washingtonian Boulevard, Suite 500, Gaithersburg, MD  20878-7352.  STP Nevada therefore is a citizen of Nevada and Maryland.

19.     STP Nevada is part of the Sigma-Tau Group of companies and therefore is owned and controlled, directly or indirectly, by the Cavazza family and their surrogates.

## JURISDICTION AND VENUE

20.     The sole Plaintiff in this action is a citizen of a foreign state, and the Defendants are citizens of Delaware, Nevada, and Maryland.  Accordingly, there is complete diversity between the parties, and this action is between citizens of a State and a citizen of a foreign state.

21.     As alleged herein, the amount in controversy between the parties substantially exceeds $75,000, exclusive of interest and costs.

22.     By virtue of the foregoing facts, this Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(2).

23.     Under section 6-102 of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland, this Court may exercise personal jurisdiction over Defendant VSL Inc. because Defendant VSL Inc. maintains its principal place of business in Maryland.

24.     Under section 6-102 of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland, this Court may exercise personal jurisdiction over Defendant STP Nevada because STP Nevada maintains its principal place of business in Maryland.

25.     Venue is properly laid in this judicial district under 28 U.S.C. § 1391(b)(1) because all Defendants are subject to personal jurisdiction in Maryland and therefore are deemed to reside there.

## FACTS COMMON TO ALL COUNTS

### A.     Prof. De Simone's Groundbreaking Work Inventing Probiotic Formulations

26.     This case involves intellectual property and contractual rights relating to the use of live bacterial cultures for consumers with disease states, such as Inflammatory Bowel Disease ("IBD"), including Ulcerative Colitis, Pouchitis and Irritable Bowel Syndrome ("IBS").

Therapeutic formulations which contain such live bacterial cultures are commonly referred to as "probiotics."

27.     Probiotics are formulations which comprise live microorganisms, most often live bacterial cultures, which may be similar to those normally present in the human gastrointestinal tract and which have a beneficial effect on the host.  Probiotics are supplied commercially in a variety of forms including capsules, tablets and sachets containing a powder dosage form, as well as in some foods such as yogurt.

28.     The consumption of probiotics can help to re-establish a healthy balance of bacteria in the intestine by replenishing beneficial bacterial strains.  The ingestion of some probiotics has been proven useful for the dietary management of patients with IBD and IBS in particular.

29.     During the 1980s and early 1990s, Prof. De Simone, a renowned medical researcher and clinician in Italy, conducted research into the clinical use of bacterial strains to treat the symptoms associated with IBD, IBS, enteral feeding, liver diseases, and many other conditions.  Prof. De Simone's work resulted in the synthesis of several probiotic formulations, which clinical experience and data demonstrated had beneficial effects on those suffering from these maladies.  Prof. De Simone obtained several patents (among other intellectual property rights) relating to his probiotic work in various countries, including in the United States.

30.     Over the ensuing years, one of Prof. De Simone's probiotic formulations, the formulation later branded as VSL#3 (the subject of this case), became the "gold standard" in its therapeutic class.  Prof. De Simone successfully conducted more than 60 human clinical trials of VSL#3, the results of which were published in various peer reviewed medical and scientific journals.  These trials demonstrated that VSL#3 is effective in the dietary management of IBD,

IBS, and a very serious and rare chronic disorder called Pouchitis.  With respect to Pouchitis, VSL#3 ultimately was recognized by the world's professional gastroenterology societies as a "standard of care"—an achievement that no other probiotic substance previously had attained.

**B.**     **Origins of Prof. De Simone's Business Relationship with the Cavazzas For the Marketing and Sale of Probiotic Products**

31.     Beginning in December 1992, Prof. De Simone applied for the issuance of a United States patent for the probiotic formulation that he invented to treat gastrointestinal disorders (the "Patent Application").

32.     On February 10, 1998, the Patent Application was granted, and United States Patent No. 5,716,615 was issued for the invention entitled "Dietary and Pharmaceutical Compositions Containing Lyophilized Lactic Bacteria, Their Preparation and Use" (the "615 Patent").  The 615 Patent describes an invention of a "pharmaceutical composition containing several different bacteria," which "are present in the composition at a total concentration of 1.times.10.sup.11 to 1.times.10.sup.13 per gram."  The 615 Patent describes a composition, which would come to be known in the commercial market (and trademarked) as VSL#3, for "treatment of a gastrointestinal disorder and hypercholesteremia" and "modulating a host's immune response."

33.     Although the 615 Patent originally listed Prof. De Simone as one of two co-inventors of the probiotic composition that later was branded as VSL#3, he initiated litigation in 2002 to declare that he is the sole inventor and owner of the 615 Patent.  Several years later, that litigation ended in a settlement agreement by which he was recognized as the sole and undisputed owner and inventor of the 615 Patent and all related intellectual property.

34.     On January 22, 2008, the 615 Patent was duly reissued by the United States Patent Office as Patent No. RE40,023 E to list Prof. De Simone as the sole inventor and owner.

35.      The 615 Patent expired on February 9, 2015.

36.      Although VSL#3 came to be manufactured, marketed, and sold through a somewhat complex corporate structure and set of supply and licensing agreements, all relevant parties to these transactions repeatedly have acknowledged over the years that the probiotic formulation underlying VSL#3 is solely owned by Prof. De Simone, and that all rights conveyed by Prof. De Simone to manufacture, market, and sell the product were temporary and would, at Prof. De Simone's election, ultimately revert to himself.

**C.      Agreement to Manufacture, Promote, Market, and Sell Products Under the 615 Patent As a Prescription Drug**

37.      In order to pursue the U.S. development, marketing, and sale of products based on the 615 Patent in the form of a prescription drug, Prof. De Simone and the Cavazza brothers (the latter through one of their existing pharmaceutical companies) formed an agreement in late 1999 by which the Cavazzas first formally acknowledged Prof. De Simone's ownership of and proprietary rights in the probiotic formula that later became known as VSL#3.

38.      On December 15, 1999, Prof. De Simone entered into an Option Agreement (the "Option Agreement") with Sigma-Tau Pharmaceuticals, Inc., a New Jersey corporation ("STP New Jersey"), which was a subsidiary of the Cavazza-owned Sigma-Tau Group.

39.      The purpose of the Option Agreement was to enable STP New Jersey to develop and distribute products under the 615 Patent in the form of a prescription drug.

40.      The Option Agreement defines the "Product" to mean "any pharmaceutical products containing lactic acid bacteria described in the Patent [which is defined as the 615 Patent] and approved by the FDA for marketing in the Territory [which is defined to be the United States], to be used in any formulation and dosage form."

41.     The Option Agreement also defines the "Know How" to mean "any scientific, technical and commercial information on the Product that are in the direct or indirect availability of Prof DE SIMONE both at the signature hereof and during the term of this Agreement and related to the promotion, manufacturing and commercialization of the Product in the Territory."

42.     The Option Agreement, under which both parties expressly acknowledged that Prof. De Simone "co-owns the Patent and fully owns the Know-How," granted STP New Jersey the right, to be exercised on or before December 31, 2001, to obtain an "Exclusive license under the Patent and the Know-How to manufacture, have manufactured, promote and sell the Product in the Territory, with the right for STPI to grant sub-licenses to its Affiliates and to third parties."

43.     The Option Agreement obligated STP New Jersey to pay certain fees to Prof. De Simone in consideration of the Option and to pay him certain royalties if the Option were to be exercised.

44.     STP New Jersey exercised the Option, and its exclusive license to use the 615 Patent and the Know How to manufacture, market, and sell probiotic products in the form of a prescription drug remained in effect until 2006, when STP New Jersey notified Prof. De Simone of its intent not to renew the license.  As a result, all of these rights previously licensed exclusively to STP New Jersey reverted to Prof. De Simone, and STP New Jersey discontinued its payments to him.

**D.     A New Initiative:  The Creation of VSL Inc.**

45.     Another collaboration between Prof. De Simone and the Cavazza brothers—VSL Inc.—was effected through certain closely held companies, formed in previous years, that each of them owned and controlled.  The purpose of the collaboration was to advance the marketing and commercialization of certain of Prof. De Simone's probiotic inventions.

12

46.     Claudio Cavazza owned and controlled a Luxembourg company named Taufin International, S.A. ("Taufin"), and Paolo Cavazza owned and controlled a Luxembourg company named Sinaf, S.A. ("Sinaf").  Prof. De Simone owned and controlled Mendes, S.r.l., an Italian company ("Mendes Italy").  In order to participate in the new collaboration, Mendes Italy was asked to set up a Luxembourg entity, which later was named Mendes International, S.A. ("Mendes International").

47.     Prof. De Simone and the Cavazzas created two holding companies through which most of the shares of VSL Inc. would be owned.  Thus, Mendes International (representing Prof. De Simone's interests), Taufin (representing Claudio Cavazza's interests), and Sinaf (representing Paolo Cavazza's interests) formed CD International, S.A., a Luxembourg company ("CD International"), in which each of them holds a one-third ownership interest.  In turn, CD Investments, S.r.l., an Italian company ("CD Investments"), was formed as a wholly owned subsidiary of CD International.  CD Investments owns 99.97 percent of the shares of VSL Inc., and Prof. De Simone, Taufin, and Sinaf each own 0.1 percent of such shares.

48.     On July 11, 2000, VSL Inc. was incorporated in Delaware.  The initial directors of VSL Inc. were appointed by Prof. De Simone, Taufin (representing Claudio Cavazza's interests), and Sinaf (representing Paolo Cavazza's interests).

49.     Under the terms of an Agreement for Product Development and Collaboration entered between the parties on July 11, 2000 (the "Collaboration Agreement") and related assignment agreements, Prof. De Simone agreed to assign to VSL Inc. a portion of his intellectual property rights as specifically identified in the Collaboration Agreement, and the Cavazzas, acting through Taufin and Sinaf, agreed to contribute capital to establish and fund the activities of VSL Inc.  Significantly, however, the 615 Patent was intentionally not listed or

identified among the intellectual property to be assigned by Prof. De Simone to VSL Inc., nor

was any other information for the product that later was branded as VSL#3 included in the

intellectual property originally conveyed by Prof. De Simone to VSL Inc.

50.     Subsequently, the Cavazzas requested that Prof. De Simone license the 615 Patent

to VSL Inc. to enable the company to commercialize a "ready to go" probiotic product for use as

a nutritional food or dietary supplement, obtain revenues rapidly, and increase its visibility as a

biotech company since the product to be marketed under the 615 Patent already had garnered

highly favorable published clinical data.  This license was later effectuated through a patent

license agreement, as described below, and decidedly was not part of the conveyance of

intellectual property rights that occurred when VSL Inc. was formed.

**E.**     **Agreements to Manufacture, Promote, Market, and Sell Products Under the 615 Patent As a Nutritional Food or Dietary Supplement**

**i.**     **Patent License Agreement Between Prof. De Simone and VSL Inc.**

51.     On  January 30, 2001, Prof. De Simone and VSL Inc. entered into a Patent

License Agreement (the "Patent License Agreement") under which Prof. De Simone granted

VSL Inc. exclusive (but temporally limited) rights to manufacture, promote, market, and sell the

"Product" in the United States in exchange for certain royalties based on net sales of the Product.

52.     A true and correct copy of the Patent License Agreement is attached hereto and

incorporated by reference herein as **Exhibit A**.

53.     The Patent License Agreement defines the "Product" to mean "any product

marketed as dietary supplement or functional food, containing lactic acid bacteria described in

the [615 Patent], to be used in any formulation and dosage form and all further developments and

improvements thereto."

54.     Unlike the Option Agreement between Prof. De Simone and STP New Jersey, the Patent License Agreement does not mention the "Know How" and does not purport to license any such information to VSL Inc.

55.     The Patent License Agreement states that it "shall continue in effect until the expiry of the Patent."

56.     In the form of a nutritional food or dietary supplement, relying upon the Patent License Agreement, VSL#3 was first offered for sale in the United States in 2002.

57.     VSL#3 is manufactured by Danisco USA, Inc., a Missouri corporation whose principal place of business is in Madison, Wisconsin ("Danisco").

ii.     **Sub-License Agreement Between VSL Inc. and STP New Jersey**

58.     When VSL#3 made its debut in the United States in 2002, Questcor Pharmaceuticals ("Questcor") was marketing and selling it under a sub-license from VSL Inc. Claudio and Paolo Cavazza had significant ownership interests in Questcor, but this company did not perform well, which resulted in low revenues for the sale of VSL#3. Questcor's sub-license expired at the end of 2003 and was not renewed by VSL Inc.

59.     On December 1, 2003, VSL Inc. and STP New Jersey entered into a license agreement (the "2003 VSL-STP License Agreement") by which, in exchange for certain down payments and royalties payable to VSL Inc., STP New Jersey was granted "an exclusive license . . . under the [615 Patent], the Know-How and the Trademark to use, manufacture and have manufactured, promote, distribute offer for sale and sell the Product in the [United States]."

60.     The 2003 VSL-STP License Agreement defines the "Know How" to mean "any and all information related to the Product, including but not limited to, discoveries, processes, formulas, clinical, scientific, technical and marketing data, which at the date of execution of this

Agreement (i) are in VSL's possession or control, and (ii) VSL considers necessary for [STP New Jersey] in order to use, manufacture or have manufactured, promote, distribute, offer for sale and sell the Product in the [United States]."

61.     The 2003 VSL-STP License Agreement defines the "Product" to be VSL#3, which is more specifically defined to mean "a probiotic preparation to be sold in the [United States] not under an approval of FDA [the U.S. Food and Drug Administration] containing [eight enumerated] strains of lactic acid bacteria."

62.     The 2003 VSL-STP License Agreement provides that VSL Inc. "shall disclose to [STP New Jersey] the Know-How which is available to VSL and which may be developed or acquired by VSL during term of this Agreement and which VSL is free to disclose."

63.     The 2003 VSL-STP License Agreement further provides that STP New Jersey "shall have manufactured the Product at its own cost and expense by a third party manufacturer to be approved in advance by VSL and strictly in accordance with [certain government approvals and permits, the reasonable instructions and suggestions of VSL Inc.], and the terms and conditions of this Agreement."

64.     Among other things, the 2003 VSL-STP License Agreement requires STP New Jersey to keep confidential and not to disclose to any other person all "Know How" and other information that it receives under the agreement, except as required by law or as necessary to obtain government approvals or for those involved in the marketing or distribution of the Product (VSL#3).

65.     The 2003 VSL-STP License Agreement also provides that the "Product shall be sold by [STP New Jersey] only under the Trademark which is and shall remain the property of VSL."  In accordance with VSL Inc.'s rights under the earlier Patent License Agreement, VSL

Inc. obtained a registered trademark for VSL#3 as the name under which STP New Jersey would market the Product.

66.     STP New Jersey further promised under the 2003 VSL-STP License Agreement "not to register or, in connection with the sale of any product, use any trademark which is identical to or confusingly similar to the Trademark, either outside or inside the [United States]."

67.     The term of the 2003 VSL-STP License Agreement expired on December 31, 2010.  The agreement was renewable for successive two-year terms unless notice of termination was given at least six months prior to the expiration of the initial term.

68.     On October 31, 2007, STP New Jersey merged into a Nevada corporation named Sigma-Tau Holding America, Inc. ("ST Holding"), whose headquarters was located in Gaithersburg, Maryland.  Immediately after the merger, ST Holding changed its name to Sigma-Tau Pharmaceuticals, Inc. (defined earlier in this Complaint as STP Nevada), which is a Defendant in this action.

69.     Under the Plan of Merger between STP New Jersey and STP Nevada, STP Nevada succeeded to all of STP New Jersey's rights, privileges, property, and debts, presumably including STP New Jersey's rights and duties under the 2003 VSL-STP License Agreement. The Plan of Merger also provided that the initial officers and directors of STP Nevada would consist of the officers and directors of ST Holding immediately prior to the merger.

     **iii.**     **Confidentiality Agreement Among Prof. De Simone, Danisco, VSL Inc., and Cavazza Entities**

70.     Beginning in or about 2005, unbeknownst to Prof. De Simone, individuals acting on behalf of the Sigma Tau affiliate company in Italy ("STP Italy")—which was selling the product VSL#3 in Italy at that time—and STP New Jersey were seeking to obtain information about the VSL#3 formulation, to enable them to make a "clone" product.  The attempt to "clone"

VSL#3 was part of a strategy of the Cavazzas to free themselves from their obligations to Prof. De Simone and to use Prof. De Simone's property for their own purposes and personal gain.  The Cavazzas previously had acted in a similar fashion in connection with a product sold under the tradename Yovis®, which Prof. De Simone had licensed to STP Italy and for which Prof. De Simone is still entitled to receive royalty payments.  However, after a period of time, STP Italy launched a modified product formulation under the same overall Yovis brand (Yovis®travel; Yovis®regular) and STP Italy resisted paying royalties on those products.

71.      In or about early 2006, the Cavazzas, acting through the management of VSL Inc. whom they controlled, insisted that more information about VSL#3 and other probiotics that VSL Inc. was planning to develop should be shared with STP Italy and STP New Jersey.  In response to this demand, and not yet knowing about the Cavazzas' plans to make a clone product based upon Prof. De Simone's proprietary know-how, Prof. De Simone agreed to enter a confidentiality agreement with VSL Inc. (as licensee), certain VSL Inc. affiliates, and Danisco (as supplier).  The purpose of the confidentiality agreement was to allow for the confidential sharing with STP Italy and STP New Jersey of certain limited information relating to VSL#3 and other probiotic projects to facilitate the marketing and sale of probiotic products around the world, while at the same time preserving Prof. De Simone's exclusive rights in the know-how and patents underlying VSL#3.

72.      More specifically, on May 10, 2006, a Confidential Disclosure Agreement was signed.  In paragraph 6 of the Confidential Disclosure Agreement, the parties expressly recognized and agreed to Prof. De Simone's sole ownership of and control over the product formulation known as VSL#3:

> Furthermore, it is hereby recognized and agreed that De Simone is the owner of the product formulation referred to as VSL #3 described in U.S. Patent n. 5,716,615 and that De Simone has licensed such product to [VSL Inc. and other parties, which] hereby confirms and instructs Danisco that De Simone shall have the right to provide notice of termination of such licenses to Danisco on behalf of [VSL and other parties and they] hereby instruct[] Danisco to discontinue the use and/or manufacture of VSL#3 . . . upon receipt of such notice.

73.     The Confidential Disclosure Agreement was signed on behalf of certain of the Cavazza-owned companies by Maurizio Terenzi, who at the time was President of CD Investments (99.7-percent shareholder of VSL Inc.) and also President of CD International (100-percent owner of CD Investments).  Mr. Terenzi was also a close financial advisor to the Cavazza family.

74.     Soon after the Confidential Disclosure Agreement was signed, Prof. De Simone learned of efforts by managers of the Sigma-Tau Group to access the proprietary formula for making VSL#3, which was known only to Danisco and Prof. De Simone.  More specifically, within a few months, Prof. De Simone was contacted by Scott Bush (Business Director, Cultures Division and Probiotics for Danisco) who informed Prof. De Simone that he had been contacted by managers of STP Italy who:  (a) sought information about the VSL#3 formulation; and (b) requested access to the bacterial strains of VSL#3, which would allow them to make a fake version of the product without the participation of Prof. De Simone.  The ability to make such a probiotic product would allow the Cavazzas to evade their obligation to pay royalties to Prof. De Simone for his know-how under the relevant agreements for VSL#3.  On information and belief, the actual sale of this contemplated "fake" product would be potentially dangerous to the health of consumers since this product necessarily would not have undergone any safety or efficacy tests in humans.

75.     It was well understood and agreed among the Cavazzas, VSL Inc. and Prof. De Simone that supply of the VSL#3 product was under the control of Prof. De Simone.  Such an understanding was confirmed and evidenced by, among many other things, the absence of any supply agreement between Danisco and any entities (including STP New Jersey and STP Nevada) that were selling the product.  In view of this understanding, Prof. De Simone brought his concerns about the attempts to make a "fake" product and misappropriate the know-how and trade secrets to the attention of Claudio Cavazza and indicated that he was considering terminating their collaboration since he no longer trusted the managers appointed by the Cavazzas.  Prof. De Simone also informed the Cavazzas that he would act to strengthen the protection of his proprietary know-how related to VSL#3 by putting an additional written agreement in place between himself and Danisco.

**iv.     Supply Agreement Between Prof. De Simone and Danisco**

76.     On June 1, 2008, Prof. De Simone entered into a written agreement with Danisco for the purpose of memorializing the terms and conditions under which Danisco would continue to manufacture VSL#3 (the "2008 De Simone-Danisco Agreement").

77.     Thus, among the recitals of the 2008 De Simone-Danisco Agreement is the statement that "DANISCO's manufacture of the product currently sold as VSL#3 or VSL #3 DS in [United States and certain enumerated other countries] has involved the use by DANISCO of [Prof. De Simone's] 'Technical Information' (as defined herein), including trade secrets, know-how, and other confidential information."  The recitals also indicate that "DANISCO's use of [Prof. De Simone's] Technical Information to date to blend final composition of, ship and/or sell the product sold as VSL#3 or VSL#3 DS in the [United States and other countries] has been with the permission of [Prof. De Simone] and with the agreed understanding that [Prof. De Simone's]

20

Technical Information is owned by [Prof. De Simone] and is to be maintained in strict confidence by DANISCO."

78.     The recitals also state that the 2008 De Simone-Danisco Agreement "sets forth the terms and conditions under which CDS is willing to allow DANISCO's continued use of [Prof. De Simone's] Technical Information for the purposes of allowing DANISCO to continue to blend final composition of, ship and/or sell the product sold as VSL#3 or VSL#3 DS in the [United States and certain other countries] to those entities designated by [Prof. De Simone] on Schedule A to this Agreement."  Among those designated entities allowed to receive VSL#3 from Danisco was STP New Jersey (for the United States but only until 2010) and VSL Inc. (for Canada, but only until 2012, and Israel until the expiration of the 2008 De Simone-Danisco Agreement).

79.     Under paragraph 2 of the 2008 De Simone-Danisco Agreement, Prof. De Simone granted Danisco "a non-exclusive, royalty free, fully paid up worldwide license to make, have made, use, offer to sell, export and import [VSL#3], incorporating [Prof. De Simone's] Technical Information for the benefit of Danisco's customers under those discoveries or inventions exclusively owned or controlled by [Prof. De Simone]."

80.     Paragraph 2 further provides that, except as necessary to enable Danisco to perform its obligations under the agreement, Danisco promised to "hold all of [Prof. De Simone's] Technical Information in strict trust and confidence for [him] in perpetuity."

81.     Paragraph 8(a) of the 2008 De Simone-Danisco Agreement sets the term of the agreement as the period from June 11, 2008 through December 31, 2012.  The agreement was, however, automatically renewable for two additional five-year periods unless terminated earlier by giving written notice at least 180 days prior to the expiration of the term.

82.     Soon after the 2008 De Simone-Danisco Agreement was signed, Prof. De Simone shared it with the Cavazzas to ensure that they and all their surrogates were aware of its strict limits on who could receive and distribute VSL#3 as a finished, consumable product.

83.     At this point, Claudio Cavazza attempted to convince Prof. De Simone to sign another agreement with a second supplier and suggested that a factory owned by the Sigma-Tau Group could be involved to make the VSL#3 product.  Given the previous attempts by Sigma-Tau managers to access Prof. De Simone's proprietary formula, he rejected Claudio Cavazza's proposal.

**v.     <u>Know How License Agreement Between Prof. De Simone and VSL Inc.</u>**

84.     After STP New Jersey merged into STP Nevada in late 2007, Prof. De Simone and VSL Inc. were planning for how the company lawfully could continue overseeing the development, production, and distribution of VSL#3 once the Patent License Agreement expired in early 2015.

85.     On September 18, 2009, the board of directors of VSL Inc., comprising Prof. De Simone, Dr. Beth Park ("<u>Dr. Park</u>"), and Mr. Terenzi (who represented the interests of the Cavazza family and the Sigma-Tau Group), met in Rome, Italy to discuss this important issue. During this meeting, Prof. De Simone made it clear that VSL Inc. would need to enter into a new agreement with him if it wished to continue marketing and selling VSL#3 because he could not risk losing control over his proprietary rights in the VSL#3 formula once the Patent License Agreement expired.  The Board then proceeded to vote (Dr. Park and Mr. Terenzi voting in favor with Prof. De Simone abstaining) to authorize Dr. Park to negotiate a "Know How" agreement that would expire on January 31, 2016 and would obligate VSL Inc. to pay Prof. De Simone a five-percent royalty on net sales of VSL#3.

86.     Given Mr. Terenzi's participation in this board meeting, his representation of the Cavazza family's and the Sigma-Tau Group's interests, and his vote in favor of the proposed new "Know How" agreement, STP Nevada had knowledge that its rights to market and sell VSL#3 depended exclusively on VSL Inc.'s agreements with Prof. De Simone.

87.     As a result of these negotiations, on January 28, 2010, Prof. De Simone and VSL Inc. entered into a Know How License Agreement (the "Know How Agreement") by which, in exchange for certain royalties payable to Prof. De Simone, he granted VSL Inc. (as stated in paragraph 2.1) "the exclusive right to his Know How and all good will associated with therewith, with the right to grant sublicenses, to manufacture, promote, market and sell [VSL#3] in the [United States]."

88.     A true and correct copy of the Know How Agreement is attached hereto and incorporated by reference herein as **Exhibit B**.

89.     Recital paragraphs A and B of the Know How Agreement acknowledge the existence of the 2001 Patent License Agreement between Prof. De Simone and VSL Inc. and that the Patent License Agreement would expire on February 10, 2015.

90.     Recital paragraph C of the Know How Agreement states Prof. De Simone's intention to grant VSL Inc. "an exclusive license related to all goodwill and Know How owned or controlled by [Prof. De Simone] associated therewith for the production and commercialization of [VSL#3] in the [United States] upon the terms and conditions set forth herein."

91.     Section 1.8 of the Know How Agreement defines the "Know How" to mean "relevant information related to [VSL#3] including but not limited to discoveries, processes, composition, technical and scientific data which are in possession or in control of [Prof. De

Simone] and are needed in order for VSL [Inc.] to have manufactured, promote, offer for sales and sell [VSL#3] in the [United States]."

92.     Under Section 3 of the Know Agreement, in exchange for VSL Inc.'s license to use the Know How, it agreed to pay Prof. De Simone "a royalty of 5% on Net Sales of the Product sold in the [United States]."  Payment of this royalty would be due "on the last day of April, July, October and January for the immediately preceding calendar quarter of each month."

93.     Section 4.1 of the Know How Agreement provides that it "shall be effective as of the date [the] Patent License Agreement expires and shall continue in effect until January 31, 2016."

94.     Section 4.2 of the Know How Agreement gives each party "the right to terminate this Agreement in the event that other Party does not fulfill one or more of its obligations provided hereunder within sixty (60) days of notice by the other Party of such breach(s)."

95.     Sections 4.3 through 4.6 of the Know How Agreement give Prof. De Simone rights to terminate the Know How Agreement "immediately with written notice" if:  (a) "there is Change of Control of VSL"; (b) "VSL no longer owns Trademarks [VSL#3 and VSL#3 DS]"; (c) the "royalty from any given year is less than the royalty from the previous year"; or (d) "there is a breach of Confidentiality Obligations envisaged in section 5 of this Agreement."

96.     Section 5.1 of the Know How Agreement defines "Confidential Information" to mean "[a]ny and all information related to the Product received by VSL or its Affiliate," including "any and all information disclosed to VSL, or its Affiliate by [Prof. De Simone] during the term of Patent License Agreement."

97.     Section 5.1 of the Know How Agreement further obligates VSL Inc. and its affiliates ("affiliates" being defined as those entities owning 50 percent or more of VSL Inc.'s

capital stock or having the ability to direct its management and operations) to keep such information "in strict confidence," subject to certain specified exceptions.

98.     Thus, under Section 5, "VSL [Inc.] acknowledges that any Confidential Information made available to VSL is to be used only in the [United States], only for [VSL#3 in the form of a "medical food"], and solely in connection with VSL[ Inc.]'s performance of its obligation of this Agreement" and that "[a]ny other use of the Confidential Information shall be considered as a material breach of this Agreement," giving Prof. De Simone the "right to terminate the Agreement immediately with written notice to VSL [Inc.]."  Section 5 further provides that its confidentiality obligations "shall survive any termination of this Agreement."

99.     Section 7 of the Know How Agreement contains mandatory choice-of-law and choice-of-forum provisions.  Thus, Article 7 provides:

> This Agreement shall be construed in accordance with and governed by the laws of Maryland, without regard to principle of conflict of law. Process in any such suit, action or proceeding may be served on any party anywhere in the world whether within or without the jurisdiction of any such court.  All issues and controversies arising hereunder will be brought in the Federal District Court of Maryland if jurisdiction exists, otherwise, in the State Courts of Maryland.   Both Parties hereby submit to the jurisdiction of the Federal and State Courts of Maryland.

**vi.     Renewal of Sub-License Agreement Between VSL Inc. and STP Nevada**

100.     On March 17, 2010, VSL Inc. notified "Sigma-Tau Pharmaceuticals, Inc." (presumably STP Nevada) at its Gaithersburg, Maryland headquarters that VSL would be terminating the 2003 VSL-STP License Agreement at the end of the agreement's initial term on December 31, 2010.

101.     STP Nevada acknowledged the termination and invited VSL to begin negotiating a new license agreement that would allow STP Nevada to continue marketing and selling VSL#3 in the United States beyond 2010.

102.     As a result of these negotiations, on or about May 1, 2010, VSL and STP Nevada

entered into a License Agreement (the "2010 VSL-STP License Agreement") by which, in

exchange for certain royalties payable to VSL Inc., STP Nevada was granted an exclusive license

(as stated in Section 2.1) "to have manufactured, promote, distribute offer for sale and sell"

VSL#3 as a "medical food" in the United States, "without the right to sublicense . . . ."  STP

Nevada also promised that it would "not make any active endeavors to solicit orders for the

Product" outside the United States and that it would "not establish any center for the

distribution" of VSL#3 outside the United States.

103.     Section 1.8 of the 2010 VSL-STP License Agreement defines the "Know How" to

mean "any relevant information related to [VSL#3] including but not limited to, discoveries,

processes, composition, clinical, scientific, technical and marketing data, which are or come into

VSL[ Inc.]'s possession or control during the Term, and are useful, in order for STPI to have

manufactured, promote, distribute, offer for sale and sell" VSL#3 as a "medical food" in the

United States.

104.     Section 3.1 of the 2010 VSL-STP License Agreement provides that VSL Inc.

shall disclose "the Know-How which is available to VSL[ Inc.], which is relevant to [VSL#3 as a

"medical food" in the United States], which may be developed or acquired by VSL during the

Term of this Agreement and which VSL is free to disclose."  This was a reference to VSL Inc.'s

rights to use and disclose the "Know How" that was defined in the Know How Agreement,

which Prof. De Simone and VSL Inc. signed four months earlier.

105.     Section 4.1 of the 2010 VSL-STP License Agreement provides that STP Nevada

"shall have manufactured [VSL#3] at its own cost and expense," that "[a]ny third party

manufacturer must be approved in advance by VSL [Inc.]," and that the "manufacture of

[VSL#3] shall be conducted strictly in accordance with the following provisions this Article IV and the terms and conditions of this Agreement."  Among the limitations on STP Nevada's rights to use the Know How set forth in Section 4 are requirements:  (a) to comply with applicable laws and regulations relating to "the manufacture, marketing, production, storage and distribution" of VSL#3 as a "medical food" in the United States; and (b) that VSL#3 "shall be manufactured using only materials supplied by a source approved by VSL" and "with the same active ingredient used in the Clinical Trials and strictly in accordance with (i) all reasonable instructions and recommendations given by VSL from time to time; (ii) current standards of good manufacturing practice; and (iii) all applicable regulatory requirements prescribed by the laws of the [United States]."

106.     In accordance with Section 4.1, STP Nevada obtained its supplies of VSL#3 from Danisco, which was continuing to manufacture the product under the terms of the 2008 De Simone-Danisco Agreement.

107.     Under Article 5 of the 2010 VSL-STP License Agreement, STP Nevada was responsible for marketing, distributing, and selling VSL#3 at its own expense.

108.     Under Section 5.3 of the 2010 VSL-STP License Agreement, STP Nevada was responsible for providing VSL Inc. with monthly reports of its sales of VSL#3 and quarterly reports detailing its marketing activities.

109.     Subject to certain exceptions, Section 5.5 of the 2010 VSL-STP License Agreement provides that, "[d]uring the Term of this Agreement and for twelve months from the termination date for any reason," STP Nevada or any "Affiliate" (defined as any entity owning 50 percent or more of STP Nevada's equity securities or having the right to appoint a majority of

its directors) "shall not sell, manufacture, have manufactured, distribute or commercialize any probiotic products other than [VSL#3]."

110.     Section 5.5 further provides that, subject to certain exceptions, neither STP Nevada nor any "Affiliate" shall "own an interest in an entity that makes, sells, distributes or commercializes an article that competes with [VSL#3] in the [United States]" or shall "in any way participate, directly or indirectly, in manufacturing, selling, distributing or commercializing an article competitive with [VSL#3] in the [United States]."

111.     Under Section 6.1 of the 2010 VSL-STP License Agreement, "[a]ny and all information related to [VSL#3] received by [STP Nevada] or by its Affiliate ('Confidential Information') shall be maintained in strict confidence" and shall be used "only for the purposes of this Agreement" and disclosed "only to those of [STP Nevada's] employees, consultants or other third parties who need to know Confidential Information for the purposes of this Agreement."

112.     Section 7.1 of the 2010 VSL-STP License Agreement defines how the required royalty to be paid for the license is to be calculated and when it must be paid.

113.     Section 7.2 requires STP Nevada to provide VSL Inc. with certain monthly sales reports as well as semi-annual reports detailing total gross sales, relevant "Net Sales," and "other information VSL may reasonably request."

114.     Section 9.1 defines the term of the 2010 VSL-STP License Agreement to be through December 31, 2015 and allows the agreement to be renewed automatically for successive two-year periods unless earlier terminated by giving written notice at least 12 months prior to the end of the initial or any renewed term.

**F.**     **The Cavazza Family Improperly Pressures**
           **Prof. De Simone to Cede Control Over VSL#3**

115.     In or about mid-2013, Andrea Montevecchi ("Mr. Montevecchi"), Chief

Executive Officer of the Sigma-Tau Group (which includes STP Nevada) and a director of STP

Nevada, contacted Prof. De Simone on several occasions to attempt to persuade him to agree to

renew the 2010 VSL-STP License Agreement for an additional five-year term beyond 2015 and

on terms that were extremely favorable to STP Nevada but economically unfeasible for VSL Inc.

116.     At around the same time, Paolo Cavazza met with Prof. De Simone and Dr. Park,

another director of VSL Inc., to discuss his proposal that STP Nevada's licensing rights to

VSL#3 be assigned to a new STP Nevada subsidiary that would handle STP Nevada's

nutraceutical business in the United States.  In exchange for such assignment, VSL Inc. and Prof.

De Simone would acquire shares in the new company, but STP Nevada would have a super

majority of such shares.  Prof. De Simone rejected this proposal.

117.     In or about November 2013, Prof. De Simone met with Enrico Cavazza, who,

along with his siblings, had assumed management of his father Claudio's businesses after

Claudio Cavazza died in 2011.  Enrico Cavazza proposed that Prof. De Simone agree to allow

VSL Inc. to purchase the strains of lactic acid bacteria to be used in VSL#3 from Biosint, a

company controlled by the Sigma-Tau Group, instead of from Danisco.  Prof. De Simone

rejected this proposal because, in his view, Biosint's bacterial strains were inferior in quality to

the strains used by Danisco and could be detrimental to consumers.  In addition, Prof. De Simone

also worried about increasing the risk that the Cavazzas could misappropriate his know-how.

118.     In or about November 2013, Prof. De Simone and Dr. Park met with Mr.

Montevecchi.  During this meeting, Mr. Montevecchi complained again about the high cost of

VSL#3 and how this was causing STP Nevada's profit margins to be too low.  Mr. Montevecchi

proposed reducing VSL#3's production cost (thus increasing profit) by changing the product's composition and substituting cheaper bacterial strains supplied by Biosint.  He argued that since VSL#3 was not being marketed as a drug in the United States, no one would notice the change in composition if everyone remained quiet about it.

119.    Prof. De Simone would have none of this.  He replied that he would never participate in a scheme to dilute the product secretly, which would violate the trust that consumers had placed in VSL#3 and could lead to adverse health consequences.  Mr. Montevecchi, however, was not so easily dismissed this time.  Disturbingly, he warned that unless VSL Inc. offered STP Nevada a better profit margin on VSL#3, Prof. De Simone was risking further confrontation with the Cavazza family.

120.    On November 21, 2013, Prof. De Simone met with Paolo Cavazza in Rome.  Mr. Cavazza explained that STP Nevada would be split into two entities, one for "orphan drug" prescription products and the other for nutraceuticals.  Mr. Cavazza stated that VSL#3 would be assigned to the nutraceutical division, probably to be called "Sigma Health Sciences," and that the brand VSL#3 would be used to include new formulations, with cheaper bacterial strains and concentrations.  Mr. Cavazza also again suggested changing the formulation of VSL#3 in order to obtain higher profitability.

121.    By the end of 2013, Prof. De Simone reached the frightening conclusion that profitability was the only objective that Paolo Cavazza and STP Nevada had with respect to VSL#3 and their plans for a new nutraceutical division, and they gave no consideration to the health risks to consumers and associated legal and ethical implications.  It had become clear that undue threats and pressure from the Cavazzas to cooperate in their plans would only grow.

122.    By March 2014, the pressure from the Cavazzas and their surrogates had indeed intensified, as Prof. De Simone had predicted several months earlier.  On March 4, 2014, Mr. Montevecchi wrote to Prof. De Simone, demanding that unless the 2010 VSL-STP License Agreement was renewed on the terms he had proposed earlier, Sinaf (Paolo Cavazza's company, which owned one-third of VSL Inc.'s parent, CD International), Taufin (representing the interests of Claudio Cavazza's heirs, which also owned one-third of CD International) or the Cavazzas themselves would bring litigation against Prof. De Simone.  At the same time, Mr. Montevecchi admitted in this communication that Prof. De Simone is the "owner of the rights on a brand with significant goodwill in the market."

123.    Three days later, on March 7, 2014, Paolo Cavazza telephoned Prof. De Simone, threatening that Sinaf and Taufin would bankrupt VSL Inc. and financially ruin Prof. De Simone and his family if Prof. De Simone did not agree to renew the Know How Agreement (which was set to expire at the end of 2015), thereby allowing VSL Inc. to sub-license to STP Nevada the rights to market and sell VSL#3 on the terms Mr. Montevecchi had demanded.  Paolo Cavazza made similar threats in a separate telephone call to Dr. Park on the same day.

124.    Less than a week later, Prof. De Simone contacted Paolo Cavazza and informed him that VSL Inc. could not accept STP Nevada's proposed terms for extending the 2010 VSL-STP License Agreement because to do so would itself bankrupt VSL Inc.

125.    On March 24, 2014, Mr. Montevecchi and another surrogate of the Cavazzas met with Dr. Park in Munich, Germany to discuss the situation.  Here again, Mr. Montevecchi threatened litigation against VSL Inc., and stated his intent to breach the contract with VSL Inc. and also warned that, if necessary, STP Nevada would launch a "copy" of VSL#3.  Mr. Montevecchi reminded Dr. Park that Sinaf and Taufin, which owned STP Nevada and owned

31

two-thirds of VSL Inc.'s ultimate parent, CD International, had the power to do whatever they wanted with VSL#3, even if their plans were not in the best interest of VSL Inc.  They further indicated to Dr. Park that their plans did not contemplate any future for VSL Inc.

126.     On May 13, 2014, Prof. De Simone received a letter from Maurizio Martinetti, a member of the board of VSL Inc.'s parent company who represented the interests of the Cavazzas.  Mr. Martinetti requested copies of VSL Inc. corporate and contractual documents starting from the year 2000.  He indicated that he was "landing from Mars," meaning that he was lacking in information even though he had been on the board of the parent company (CD Investments) for seven years with full access to all documents and contracts to approve all the financial statements of VSL Inc. in the past years.

127.     The sudden demand for information by Mr. Martinetti, acting as an agent for STP Nevada and the Sigma-Tau Group, amounted to a "fishing expedition" designed to harass and threaten Prof. De Simone and to remind him that VSL Inc. was ultimately the property of the Cavazzas and that they would try to do whatever they wanted with it, even against the best interests of the company.  In addition, Mr. Martinetti verbally indicated that the Cavazzas intended to put VSL Inc. under the control of a different CEO and to increase the size of the board of directors so that they could take control of the company's finances and the manufacture of the VSL#3 product.  On information and belief, STP Nevada and the Sigma-Tau Group planned to sell a different product, never tested before or studied even in animals, under the brand VSL#3 (or a confusingly similar brand) once the Cavazzas took control of VSL Inc.

128.     Prof. De Simone became further alarmed when he learned that an attorney in the U.S. with responsibilities for regulatory matters related to the use of VSL#3 as a medical food

was contacted by an attorney acting for STP Nevada who sought access to confidential information of Prof. De Simone relating to the VSL#3 product.

129.     By mid-2014, the evidence supporting Prof. De Simone's suspicion that STP Nevada and related companies planned to market a "clone" of VSL#3 was mounting and emanated from multiple independent sources.  This reckless conduct gravely concerned Prof. De Simone, who considered these actions to be unethical and in disregard for the safety of consumers who are immunosuppressed and rely on VSL#3 to address their medical conditions. In the absence of appropriate testing for safety and efficacy, no bacterial product should be made available to be administered to immunosuppressed consumers, since it can be dangerous and even lethal.  This fact is well established in the medical community and of major concern for Prof. De Simone.

130.     On or about June 4, 2014, a meeting of the shareholders of CD International (VSL Inc.'s ultimate parent company) was held in Luxemburg.  At that meeting, Dr. Park made a presentation of the alternative business scenarios then available to VSL Inc., which clearly demonstrated that if the VSL#3 product was licensed to STP Nevada on the conditions sought to be imposed by Mr. Montevecchi, VSL Inc. would be financially non-viable within a relatively short period of time.  The Cavazzas refused to attach the text submitted by Dr. Park to the minutes of the meeting.

131.     Immediately following the shareholders meeting, Sinaf and Taufin changed the majority of the board members of the controlling company (CD Investments) of VSL Inc. Afterwards, through their U.S. attorneys, they falsely accused Prof. De Simone of "wrongdoing including breaching of fiduciary duties."  VSL Inc. was significantly increasing its revenues under the management of Prof. De Simone and Dr. Park over the preceding few years.  This

period of success was preceded by a very distressing period of financial problems, when VSL Inc. was managed by individuals appointed by the Cavazzas who also held positions in STP Italy and STP Nevada.  The accusations against Prof. De Simone and Dr. Park were an obvious tactic to pressure them to bend to the requests of the Cavazzas for the benefit of STP Nevada.

132.    Throughout the spring and summer of 2014, surrogates of the Cavazzas, who also were representing CD Investments and STP Nevada, actively sought to create a "clone" of the VSL#3 formulation.  In fact, Paolo Cavazza himself declared that he was in the advanced process of making a clone of VSL#3.

133.    During the summer of 2014, Taufin, Sinaf, and CD Investments began making a series of demands to inspect VSL Inc.'s books and records.  VSL Inc. refused these demands because they did not comply with the proper-purpose requirement of Delaware law.

134.    On September 4, 2014, CD Investments, in its capacity as the owner of 99.97 percent of the shares of VSL Inc., adopted a written consent changing certain of VSL Inc.'s bylaws.  This was unlawful because written consents are not effective actions of the shareholders of Delaware corporations unless they are adopted unanimously.  Without such unanimous support, any change in VSL Inc.'s bylaws could only be effected at a duly noticed meeting of VSL Inc.'s shareholders, which included Prof. De Simone (who owned 0.1 percent of VSL Inc.'s shares).  Among other things, the illegal change in VSL Inc.'s bylaws purported to:  (a) increase the number of VSL Inc.'s permissible directors to three; (b) eliminate indemnification for VSL Inc.'s directors; and (c) amend VSL Inc.'s bylaws to require that future amendments be approved by all directors, not just a majority of directors.  This written consent of CD International also contained a resolution electing James Brady ("Mr. Brady") as a new director of VSL Inc. (Prof. De Simone and Dr. Park being the other two).

135.    On September 11, 2014, CD Investments and Sinaf filed suit against VSL Inc. in the Delaware Chancery Court to enforce previous demands for the inspection of VSL Inc.'s books and records.  Paragraph 8 of their Verified Complaint alleges that VSL Inc.'s "formation derived from a Product Development and Collaboration Agreement (the 'Product Development Agreement') among the following entities:  (1) Mendes International SA; (2) Sinaf; (3) Taufin; (4) Mendes Srl ('Mendes'); and (5) De Simone."  Paragraph 8 further alleges that "De Simone was the majority stockholder of the Mendes entities" and that the "purpose of the Product Development Agreement was to optimize the commercial value of certain patents that De Simone owned."

136.    Paragraph 9 of CD Investments and Sinaf's Verified Complaint alleges that "[p]ursuant to the Product Development Agreement, and in exchange for financial backing, De Simone and the entities which he controlled were supposed to transfer all of their rights in certain U.S. patents to the Company, including U.S. patents for VSL #3, a probiotic medical food."

137.    Several weeks later, on September 29, 2014, Mr. Brady made a demand for inspection of VSL Inc.'s books and records that was virtually identical to demands previously made on behalf of Taufin, Sinaf, and CD Investments.

138.    VSL Inc. refused Mr. Brady's demand on two grounds.  First, Mr. Brady was demanding that copies of the books and records be sent to the lawyer representing CD Investments and Sinaf in the pending litigation against VSL Inc., which appeared to be a tactic to circumvent that litigation.  Second, Mr. Brady had refused to enter into a confidentiality agreement that would prohibit his sharing of information with the Cavazzas and their surrogates —a request born of Prof. De Simone's well-founded suspicion that the Cavazzas were attempting

to gather as much information from VSL Inc. as possible to aid their ongoing attempt to clone VSL#3 using inferior and potentially dangerous ingredients.

139.    On October 10, 2014, Mr. Brady filed a virtually identical Verified Complaint against VSL Inc. in the Delaware Chancery Court.  Mr. Brady's Complaint makes identical allegations to those set forth in paragraphs 8 and 9 of the Verified Complaint filed several weeks earlier by CD Investments and Sinaf.

140.    By letter dated October 15, 2014 addressed to the other directors of VSL Inc., and in his capacity as a director of the company, Mr. Brady asserted that VSL Inc. owns or may own all intellectual property rights in VSL#3 based on:  (a) Article VII of VSL Inc.'s bylaws, by which Prof. De Simone purportedly was obligated to transfer to VSL Inc. "all rights owned by [De Simone], directly or through another person, whether patent, trademark, copyright or otherwise, related to any inventions made by [De Simone] in the field of pharmaceutical nutritionals compositions and active principles"; and (b) the purported assignment from Mendes, S.r.l. to VSL Inc., dated September 18, 2000 and signed by Prof. De Simone (the "Mendes Patent Assignment"), of "all right title and interest to the intellectual property relating to VSL#3, including know-how and trade secrets related thereto."

141.    Article VII of VSL Inc.'s bylaws reads in full as follows:

Section 7.  Transfer of Inventions.

As long as Professor Claudio De Simone owns, directly or indirectly, 4.99% or more of the total voting stock of the Corporation, he shall transfer or offer to transfer, without the payment of further consideration by the Corporation, all rights owned by him, directly or through another person, whether patent, trademark, copyright or otherwise, relating to *any inventions made by him in the field of pharmaceutical nutritionals compositions and active principles*, whether for animal or human use, *since the incorporation of the Corporation*, to the Corporation [emphasis added].

142.     Although the Delaware litigations ultimately were settled, both Dr. Park and Prof. De Simone resigned from VSL Inc.'s board of directors, and Prof. De Simone also resigned as Chief Executive Officer of the company.  Mr. Brady was thus left as the sole remaining director.

143.     Nevertheless, the positions taken by CD Investments, Sinaf, and Mr. Brady (on behalf of VSL Inc.) that VSL Inc. owns or has a claim to ownership of the 615 Patent and Prof. De Simone's proprietary formula for VSL#3 contradict their respective contractual acknowledgments in the Patent License Agreement (2001), the Confidential Disclosure Agreement (2006), and the Know How Agreement (2010) that Prof. De Simone owns these rights.

144.     These positions also are at odds with Mr. Montevecchi's admission in March 2014, on behalf of STP Nevada, that Prof. De Simone owns the intellectual property rights in VSL#3.

## G.     Termination of VSL Inc.'s Rights to Sell VSL#3

145.     On or about November 14, 2014, Prof. De Simone provided written notice to VSL Inc. that he was terminating the Know How Agreement on the basis of the change-of-control provision and because of VSL Inc.'s breach of the confidentiality provisions of the agreement.

146.     The same day, Prof. De Simone provided written notice of the termination of the Know How Agreement to Sinaf, Taufin, and CD Investments, all of whom, directly or indirectly, own shares in VSL Inc.  In this letter, Prof. De Simone also proposed entering into a new, restructured business arrangement with VSL Inc., by which he would assume direct responsibility for marketing and selling VSL#3.

147.     In identical letters to Prof. De Simone dated November 28, 2014, Taufin and Sinaf (representing the Cavazzas' interests) acknowledged receipt of Prof. De Simone's

November 14 letter and the existence of the Know How Agreement. They also requested further information in order to evaluate Prof. De Simone's business proposal, but they did not dispute that the Know How Agreement had been terminated and that VSL Inc. and STP Nevada no longer had authority to sell VSL#3 in the United States.

148.     On December 5, 2014, Prof. De Simone wrote to STP Nevada itself, advising that the Know How Agreement had been terminated and that VSL Inc. had rejected the business proposal set forth in his November 14 letter. Prof. De Simone also pointed out that "VSL does not have any rights to pass to [STP Nevada] [the rights] to purchase the active ingredient from Dupont [Danisco's parent] upon the expiration of its patent license in February 2015." Prof. De Simone also invited STP Nevada to discuss a proposed a new business arrangement, which would allow STP Nevada to continue selling VSL#3 in the United States after expiration of the Patent License Agreement.

149.     On December 24, 2014, STP Nevada, by counsel, acknowledged receipt of Prof. De Simone's December 5 letter and expressed interest in exploring his proposed business arrangement.

150.     VSL Inc. did not pay royalties due on January 31, 2015, breaching its obligations under the Patent License Agreement. No explanation was given. On February 10, 2015, the Patent License Agreement between VSL Inc. and Prof. De Simone expired.

151.     The expiration of the Patent License Agreement and the termination of the Know How Agreement left VSL Inc. and STP Nevada without any authority to use, sell, or disclose Prof. De Simone's proprietary methods of growing, the analysis of, and the selection/ratio of the eight strains of bacteria comprising VSL#3, which are valuable trade secrets.

152.   Despite its demonstrable lack of legal authority to do so, VSL Inc. is continuing to acquire stocks of VSL#3 from Danisco and to allow STP Nevada to market and sell the product in the United States.  Not only are VSL Inc. and STP Nevada failing to pay Prof. De Simone royalties for this sales activity, they both are continuing to use and exploit Prof. De Simone's valuable trade secrets for commercial gain but without his permission.

153.   In their Complaints filed in the Delaware books-and-records demand litigation, CD Investments, Sinaf, and Mr. Brady all have taken the position that VSL Inc. either owns or has a claim of ownership of all rights in certain U.S. patents held by Prof. De Simone, including the U.S. patents for VSL #3.  This is in stark contradiction to the numerous prior agreements entered among the relevant parties in which it was clearly acknowledged that Prof. De Simone, and only Prof. De Simone, is the sole rightful owner of all intellectual property rights relating to the probiotic formulation underlying VSL#3.

154.   More recently, in December 2014, the Cavazzas caused Actial Farmaceutica LDA, a Portugese company ("Actial") that, along with VSL Inc. and another entity, is a subsidiary of CD Investments, to file suit against Prof. De Simone in the High Court of Justice of the United Kingdom.  As noted earlier, CD Investments is a wholly owned subsidiary of CD International, two-thirds of which is owned by the Cavazza family through Taufin and Sinaf.  In this UK litigation, the Cavazzas and their surrogates took the incorrect position that, by virtue of the Collaboration Agreement signed on July 11, 2000 (the same day VSL Inc. was incorporated) by Prof. De Simone, his affiliated companies, and Taufin and Sinaf, Prof. De Simone had agreed to transfer all his rights relating to existing inventions in the pharmaceutical nutritional field to VSL Inc.

155.    Despite the Cavazza's new position, the 615 Patent is conspicuously absent from the patents listed in the schedules to the Collaboration Agreement.  Furthermore, their position is inconsistent with the 1999 Option Agreement between Prof. De Simone and STP New Jersey, by which STP New Jersey acquired a license, from 2000 to 2006, allowing it to use the 615 Patent and Prof. De Simone's trade secrets to commercialize VSL#3 as a drug in the United States.

156.    In January 2015, a petition was filed with the U.S. Trademark Trial and Appeal Board to cancel the VSL#3 trademark, which is owned by VSL Inc., on the ground that the mark "VSL#3" has become generic.

157.    VSL Inc.'s answer to this petition, filed on March 30, 2015, alleges that VSL Inc. owns the "formulation of, and methodology of producing," and "owns all right, title, and interest in and to the trade secrets and know-how relating to," VSL Inc.'s products, including VSL#3.

158.    As a result of the events of 2014 and early 2015:  (a) VSL Inc. and STP Nevada each have repudiated their contractual acknowledgments that Prof. De Simone owns and controls the intellectual property rights in the VSL#3 formula and related trade secrets; (b) VSL Inc. wrongfully has ceased paying Prof. De Simone royalties under the Patent License Agreement for sales of VSL#3 made in 2014 and 2015; (c) VSL Inc. wrongfully is continuing to permit STP Nevada to market and sell VSL#3 despite knowing that it no longer has any legal rights to do; and (d) STP Nevada is being unjustly enriched and is misappropriating Prof. De Simone's trade secrets by continuing to profit from the sale of VSL#3, knowing that it lacked any legal rights to do so after November 2014.

## COUNT I
**(Declaratory Judgment Pursuant to 28 U.S.C. § 2201—Against Both Defendants)**

159.     Prof. De Simone adopts by reference each and every one of the foregoing factual allegations as if alleged in full in Count I, except as they may be inconsistent with the specific allegations contained in Count I.

160.     By virtue of the lawsuits filed against VSL Inc. in Delaware in the fall of 2014 by CD Investments, Sinaf, and Mr. Brady, and by virtue of Mr. Brady's other communications to Prof. De Simone and Dr. Park, VSL Inc. and STP Nevada are contesting and denying Prof. De Simone's rightful claims to ownership of the intellectual property rights underlying the VSL#3 product.

161.     VSL Inc. was incorporated on July 11, 2000.

162.     The 615 Patent was issued on February 10, 1998 and reissued as Patent No. RE40,023 E on January 22, 2008 to list Prof. De Simone as the sole inventor and owner.

163.     Prof. De Simone created the invention described in the 615 Patent (which became known as VSL#3) and developed all associated trade secrets long before the incorporation of VSL Inc. on July 11, 2000.

164.     As a result, the 615 Patent and the associated trade secrets are not among the intellectual property that Prof. De Simone was obligated to transfer to VSL Inc. according to the Collaboration Agreement.  Moreover, Article VII, Section 7 of the company's bylaws does not require transfer of these intellectual property rights both because their creation predates the formation of VSL Inc. and because other conditions precedent in Section 7 did not occur.

165.     By its terms, the Mendes Patent Assignment of September 18, 2000 assigned to VSL Inc. Mendes, S.r.l.'s "entire right, title and interest . . . in and to the said inventions as

described in said patents and patent applications" that are set forth on Schedule I to the Mendes Patent Assignment.

166.     VSL#3, the invention described in the 615 Patent, and the associated trade secrets are nowhere mentioned on Schedule I to the Mendes Patent Assignment.

167.     Mendes has never assigned to VSL Inc. the invention described in, or any other intellectual property rights arising from, the 615 Patent.

168.     Since Prof. De Simone and Dr. Park resigned from VSL Inc.'s board of directors, the company has adopted the position advanced by Director Brady, namely, that, by virtue of Article VII of VSL Inc.'s bylaws and the Mendes Patent Assignment, VSL Inc. owns or has a claim to ownership of the intellectual property rights arising from the invention described in the 615 Patent.

169.     Prof. De Simone strongly disputes that either he or Mendes, S.r.l. assigned or agreed to assign any rights in the invention described in the 615 Patent, or its associated trade secrets, to VSL Inc. in September 2000 or at any other time.

170.     By virtue of the foregoing facts, there is an actual and justiciable controversy, of sufficient immediacy and reality, between the parties over who owns the intellectual property rights arising from or related to the invention described in the 615 Patent, including the aforementioned trade secrets.

171.     As alleged herein, this Court possesses an independent basis for subject-matter jurisdiction over the parties:  diversity of citizenship.

172.     Issuance of the declaratory judgment prayed for herein will serve a useful purpose in clarifying and settling Prof. De Simone's ownership of the intellectual property rights in the 615 Patent and will terminate and afford relief from the uncertainty, insecurity, and controversy

giving rise to this proceeding.  Such uncertainty, insecurity, and controversy has already arisen because of the positions taken in the Delaware litigation and because VSL Inc. has now adopted those positions, which Prof. De Simone vigorously contests.

## COUNT II
### (Breach of Contract—Patent License Agreement—Against VSL Inc.)

173.    Prof. De Simone adopts by reference each and every one of the foregoing factual allegations as if alleged in full in Count II, except as they may be inconsistent with the specific allegations contained in Count II.

174.    The Patent License Agreement is a valid, binding, and enforceable contract between Prof. De Simone and VSL Inc., supported by the consideration of the mutual promises and undertakings expressed therein.

175.    Prof. De Simone has substantially performed all of his duties under the Patent License Agreement.

176.    Under Section 4.1 of the Patent License Agreement, in exchange for the license granted to VSL Inc. of the rights in the 615 Patent, VSL Inc. promised to pay Prof. De Simone "a royalty of 3 % on Net Sales of the Products sold by VSL for Net Sales up to and including US$ 50,000,000.00"; and "a royalty of 5 % on Net Sales of the Products sold by VSL for Net Sales in excess of US$ 50,000,000.00."

177.    Since the beginning of 2014, VSL Inc. has failed to pay Prof. De Simone any royalties on its Net Sales of VSL#3, thereby materially breaching its obligations under Section 4.1.

178.    As a direct and proximate result of VSL Inc.'s breach of the Patent License Agreement, Prof. De Simone has suffered compensatory damages in an amount to be proven at trial but in no event less than $5,000,000.00.

## COUNT III
## (Unjust Enrichment—Against Both Defendants)

179.     Prof. De Simone adopts by reference each and every one of the foregoing factual allegations as if alleged in full in Count III, except as they may be inconsistent with the specific allegations contained in Count III.

180.     On or about November 14, 2014, Prof. De Simone validly terminated The Know How Agreement on the grounds that there had been a change of control of VSL Inc. and because of VSL Inc.'s breach of its duty of confidentiality under the agreement.

181.     As a result, VSL Inc. had no rights to continue marketing and selling VSL#3 in the United States after the Patent License Agreement expired on February 10, 2015.  VSL Inc. rights were also cut off by virtue of its failure to pay royalties due under the Patent License Agreement.

182.     By virtue of the termination of the Know How Agreement and the expiration and material breach of the Patent License Agreement, VSL Inc. no longer could validly sub-license any rights to market and sell VSL#3 to STP Nevada.

183.     By virtue of VSL Inc.'s and STP Nevada's continuing and unauthorized marketing and sale of VSL#3 in the United States, they are realizing profits to which they are not entitled.

184.     On information and belief, VSL Inc. acquired, or allowed STP Nevada to acquire, a substantial inventory of the VSL#3 product for distribution and sale in the United States after both companies knew that their legal rights to engage in such activity had lapsed.

185.     By virtue of Danisco's ability to manufacture VSL#3 using Prof. De Simone's proprietary and secret formula, Prof. De Simone has conferred a valuable benefit on VSL Inc.

44

and STP Nevada, consisting of the value of the VSL#3 that one or both companies currently possess.

186.    VSL Inc. and STP Nevada knowingly have accepted this valuable benefit under circumstances giving each of them reason to know that their continued use and enjoyment of it creates an obligation to pay for its value.

187.    As a matter of equity and good conscience, VSL Inc. and STP Nevada should be ordered to make restitution to Prof. De Simone of all profits both companies have gained as a result of their continuing, unauthorized marketing and sale of VSL#3.  In addition, they should be required to return to Danisco any amount of the product that they currently hold in inventory.

**COUNT IV**
**(Misappropriation of Trade Secrets—Against Both Defendants)**

188.    Prof. De Simone adopts by reference each and every one of the foregoing factual allegations as if alleged in full in Count IV, except as they may be inconsistent with the specific allegations contained in Count IV.

189.    Since at least 2002, the formula and method of growing and mixing the eight strains of lactic acid bacteria in VSL#3 have been used in a business and have afforded a demonstrable competitive advantage to Prof. De Simone and VSL Inc.

190.    VSL#3's formula and selection criteria for the bacterial strains are in fact secret and are not a matter of public knowledge.  They are not generally known to, and not readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

191.    The formula and selection criteria for the bacterial strains are known only to Prof. De Simone and to Danisco.  Prof. De Simone has made efforts reasonable under the circumstances to maintain the secrecy of the formula and selection criteria for the bacterial

strains, including by entering into:  (a) the Confidential Disclosure Agreement with Danisco, VSL Inc., and VSL Inc.'s parent companies, which obligates all parties to maintain the secrecy of the formula; (b) the 2008 De Simone-Danisco Agreement, which obligates Danisco to maintain the secrecy of the formula; and (c) the Know How Agreement with VSL in 2010, which obligates VSL Inc. to hold in strict confidence, and limit VSL Inc.'s ability to use or disclose "relevant information related to [VSL#3] including but not limited to discoveries, processes, composition, technical and scientific data" that are in Prof. De Simone's possession or in control and are necessary for VSL Inc. to perform its duties under the Know How Agreement.

192.    In addition, the 2010 VSL-STP Agreement obligates STP Nevada to keep strictly confidential, and not use for purposes other than performing its obligations under the agreement, "all information related to" VSL#3 "received by [STP Nevada] or by its Affiliate."

193.    The VSL#3 formula and selection criteria for the bacterial strains have value to Prof. De Simone and anyone who would compete with him or his affiliated companies because there is no competitive product that replicates VSL#3's  precise mix of bacteria strains and the health benefits it offers.

194.    Prof. De Simone has expended great sums of money and considerable efforts over many years in developing the VSL#3 formula and selection criteria for the bacterial strains.

195.    It would be extremely difficult, if not impossible, for anyone to produce or duplicate VSL#3 without access to the formula and selection criteria for the bacterial strains.

196.    By virtue of the foregoing facts, the VSL#3 formula and selection criteria for the bacterial strains are trade secrets within the meaning of 11-1201 of the Commercial Law Article of the Annotated Code of Maryland.

197.    VSL Inc. and STP Nevada have acquired a considerable inventory of VSL#3 from Danisco, which allows them to continue to market and sell VSL#3 in spite of the fact that their contractual rights to do so have expired or been terminated.  The inventory of VSL#3 possessed by VSL Inc. and STP Nevada was manufactured using Prof. De Simone's proprietary formula and selection criteria for the bacterial strains, which are trade secrets.  This inventory could not exist but for the trade secrets used in manufacturing it.  As a result, both Defendants have acquired and are using Prof. De Simone's trade secrets without his express or implied consent.

198.    Given their knowledge of the termination of their contractual rights to market and sell VSL#3, VSL Inc.'s and STP Nevada's continued accumulation of an inventory of the product after such rights terminated amounts to an acquisition of Prof. De Simone's trade secrets with knowledge or reason to know that such trade secrets were acquired by improper means.

199.    Since no later than February 10, 2015, VSL Inc. and STP Nevada also have been using and profiting from Prof. De Simone's trade secrets—by marketing and selling VSL#3— knowing or having reason to know that they were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use.  Such circumstances include the Defendants' entry into or knowledge of the Patent License Agreement, the Know How Agreement, the 2010 VSL-STP License Agreement, and the agreements with Danisco, all of which do not permit VSL Inc. and STP Nevada to market and sell VSL#3 after the applicable licensing rights expired or were terminated.

200.    By virtue of the foregoing facts, VSL Inc. and STP Nevada have misappropriated Prof. De Simone's trade secrets.

201.    VSL Inc.'s and STP Nevada's continuing marketing and sale of VSL#3 has proximately caused Prof. De Simone to suffer damages, or has unjustly enriched the Defendants,

as measured by the value of the VSL#3 inventory in their possession or control, which is worth at least $3,000,000.00.

202.    Given that the Defendants both are well aware that their legal rights to continue marketing and selling VSL#3 no longer exist, their persistence in this conduct amounts to a willful and malicious misappropriation of Prof. De Simone's trade secrets.  As a result, Prof. De Simone is entitled to an award of exemplary damages, not exceeding twice the damages he has suffered as a direct and proximate result of such conduct, as well as reasonable attorneys' fees under sections 11-1203 and 11-1204 of the Commercial Law Article of the Annotated Code of Maryland.

**COUNT V**
**(Civil Conspiracy—Against Both Defendants)**

203.    Prof. De Simone adopts by reference each and every one of the foregoing factual allegations as if alleged in full in Count V, except as they may be inconsistent with the specific allegations contained in Count V.

204.    As reflected in their acts and omissions in 2014, as alleged herein (if not before then), VSL Inc. and STP Nevada entered into a tacit agreement to misappropriate and wrongfully claim ownership of Prof. De Simone's trade secrets after February 10, 2015, when their legal rights to market and sell VSL#3 terminated.

205.    Since February 10, 2015, VSL Inc. and STP Nevada have continued to market and sell VSL#3, despite knowing of their lack of any legal right to do so, and this conduct has been in furtherance of Defendants' conspiracy to misappropriate Prof. De Simone's trade secrets.

206.    As a direct and proximate result of this conspiracy, and the acts taken in furtherance of it, Prof. De Simone has suffered damages in the amount of at least $3,000,000.00,

which is the value of the VSL#3 inventory that the Defendants possess and from which they are illegally profiting.

207.    Given that the Defendants both are well aware that their legal rights to continue marketing and selling VSL#3 no longer exist, their persistence in this conduct amounts to a knowing, conscious, and reckless disregard for Prof. De Simone's legal rights and the risk of harm Defendants' conduct was likely to cause, and is causing, him.  Defendants therefore have acted with actual malice.

208.    Under the circumstances, the assessment of punitive damages in the amount of $1,500,000.00 is necessary to punish VSL Inc.'s and STP Nevada's misconduct and deter such behavior by them and others.

WHEREFORE, Prof. De Simone demands judgment against Defendants:

A.      On Count I (Declaratory Judgment), declaring that Prof. De Simone is the lawful and rightful owner of all intellectual property rights arising from or related to the invention described in the 615 Patent and all associated trade secrets, including, but not limited to, the proprietary formula, selection criteria for the bacterial strains, and all related know-how underlying the VSL#3 product;

B.      On Count II (Breach of Contract), awarding Prof. De Simone compensatory damages in an amount to be proven at trial but in no event less than $5,000,000.00 and enjoining Defendants from taking any actions to commercialize any products utilizing the proprietary formula or any related know how and intellectual property rights underlying the VSL#3 product;

C.      On Count III (Unjust Enrichment), ordering VSL Inc. and STP Nevada, jointly and severally, to make restitution to Prof. De Simone for the value of the VSL#3 inventory they have held since February 10, 2015, the value of which is at least $3,000,000.00, and for the

aggregate profits both companies have received for their sale of VSL#3 since February 10, 2015, and enjoining Defendants from taking any actions to commercialize any products utilizing the proprietary formula or any related know how and intellectual property rights underlying the VSL#3 product;

D.      On Count IV (Misappropriation of Trade Secrets), awarding Prof. De Simone:  (1) compensatory damages in an amount to be proven at trial but in no event less than $3,000,000.00; (2) exemplary damages of twice the amount of Prof. De Simone's actual damages; and (3) the reasonable attorneys' fees he has incurred and will incur in protecting his trade secrets; and enjoining Defendants from taking any actions to commercialize any products utilizing the proprietary formula or any related know how and intellectual property rights underlying the VSL#3 product;

E.      On Count V (Civil Conspiracy), awarding Prof. De Simone:  (1) compensatory damages in an amount to be proven at trial but in no event less than $3,000,000.00; (2) punitive damages in the amount of $1,500,000.00; and (3) an injunction prohibiting Defendants from taking any actions to commercialize any products utilizing the proprietary formula or any related know how and intellectual property rights underlying the VSL#3 product;

F.      Awarding such costs against all Defendants as may seem equitable and just under section 3-410 of the Courts and Judicial Proceedings Article of the Maryland Code; and

G.      Awarding such other, further, and general relief as to the Court seems just and proper.

Dated:  May 11, 2015

> **SHULMAN, ROGERS, GANDAL,**
> **PORDY & ECKER, P.A.**
>
>
> By:  _____/s/ Jeremy W. Schulman_____
> Jeremy W. Schulman (Fed. Bar No. 16787)
> Alexander C. Vincent (Fed. Bar No. 17207)
> 12505 Park Potomac Avenue, 6th Floor
> Potomac, Maryland  20854-6803
> Telephone:  (301) 230-5200
> Facsimile:  (301) 230-2891
> E-mail:  jschulman@shulmanrogers.com
>              avincent@shulmanrogers.com
>
> *Counsel for Plaintiff*
> *Professor Claudio De Simone*

## JURY DEMAND

In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, Professor De Simone hereby demands a trial by jury on all issues raised by the claims asserted in the foregoing Complaint that are triable as of right by a jury.

Dated:  May 11, 2015

> **SHULMAN, ROGERS, GANDAL,**
> **PORDY & ECKER, P.A.**
>
>
> By:  _____/s/ Jeremy W. Schulman_____
> Jeremy W. Schulman, Esq.